IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

| | |
|---|---|
| THE AMERICAN CIVIL LIBERTIES UNION OF FLORIDA, INC., FAIR VOTE FLORIDA, OUR VOTES MATTER, and FLORIDA VOTES MATTER,<br><br>    *Plaintiffs*,<br><br>v.<br><br>LAUREL LEE, in her official capacity as FLORIDA SECRETARY OF STATE,<br><br>    *Defendant*. | Case No. 4:21-CV-190-AW-MJF |

## <u>PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM IN SUPPORT</u>

Plaintiffs the American Civil Liberties Union of Florida, Inc. (ACLU of Florida), Fair Vote Florida, Our Votes Matter, and Florida Votes Matter move the Court pursuant to Federal Rule of Civil Procedure 65(a) for a preliminary injunction enjoining Defendant the Secretary of State from enforcing Senate Bill 1890's limit on contributions to sponsors of constitutional amendment initiatives. In support thereof, Plaintiffs state:

1. On May 7, 2021, Governor DeSantis signed SB 1890 into law. It becomes effective July 1, 2021. Ch. 2021-16, Laws of Fla.

2. SB 1890 amends section 106.08, Florida Statutes, to impose a $3,000

limit on the contributions a person or political committee may give to a committee sponsoring a state ballot initiative. *Id.* § 1 (amending § 106.08, Fla. Stat. (2020)).

3. Plaintiffs are challenging SB 1890's contribution limit as an undue burden on their speech and associational rights under the First Amendment to the U.S. Constitution, as incorporated against the states by the Fourteenth Amendment.

4. Fair Vote Florida, Our Votes Matter, and Florida Votes Matter (collectively, "Committee Plaintiffs") planned to solicit and accept contributions in excess of SB 1890's limit after the July 1 effective date, and they still desire to do so. If it were lawful, the Committee Plaintiffs would solicit and accept such contributions.

5. The ACLU of Florida planned to make contributions to the Committee Plaintiffs in excess of SB 1890's limit after its effective date, and it still desires to do so. If it were lawful, the ACLU of Florida would make such contributions.

6. Plaintiffs seek to preliminarily enjoin the Secretary from enforcing the provision of § 106.08, Florida Statutes, as amended by SB 1890, that limits contributions to a political committee sponsoring a constitutional amendment proposed by initiative, on the grounds that the limit violates the First Amendment.

7. This Court should enter a preliminary injunction enjoining the Secretary from enforcing SB 1890's contribution limit, pending the entry of a final judgment, for the reasons set forth more fully in the following Memorandum of Law.

## MEMORANDUM OF LAW

This Motion seeks urgently needed preliminary relief to enjoin the enforcement of SB 1890, which unconstitutionally burdens Plaintiffs' rights of speech and association by imposing a limit on contributions to sponsors of statewide ballot initiatives. Plaintiffs—who are three initiative sponsors and an organization supporting them—are launching a campaign to circulate petitions and collect over two million signatures to place three initiatives on Florida's 2022 ballot. If not enjoined, Plaintiffs' efforts to engage with voters, convince voters to support their initiatives, collect petitions, and advance their initiatives will be severely impaired. Indeed, if SB 1890's contribution limit is not quickly struck down, Plaintiffs will be unable to put their initiatives on the ballot.

"The restraint imposed by [an initiative contribution limit] on rights of association and in turn on individual and collective rights of expression plainly contravenes both the right of association and the speech guarantees of the First Amendment." *Citizens Against Rent Control v. City of Berkeley*, 454 U.S. 290, 299 (1981). Florida cannot be permitted to unduly burden Plaintiffs' First Amendment rights in this way. Plaintiffs respectfully request that this Court preliminarily enjoin the challenged portion of SB 1890 to prevent imminent and irreparable injury to Plaintiffs and other Florida citizens.

## I. FACTUAL BACKGROUND

### A. The Initiative Right in Florida and Challenged Provision of SB 1890

For over fifty years, Floridians have had the right to propose initiatives to their Constitution. *See* Art. XI, § 3, Fla. Const. By forming a political committee, submitting the proposed amendment to the Secretary, collecting the requisite signatures, obtaining a favorable advisory opinion from the Florida Supreme Court, and securing voter approval, Floridians can amend the State Constitution directly when the Legislature fails to carry out the people's will. *Id.* art. XI, §§ 3, 5; §§ 16.061, 100.371, Fla. Stat. But ever since the first citizen's initiative was proposed in 1976, the Florida Legislature has repeatedly tried to restrict the people's right to amend their constitution by initiative. *See* ECF No. 9 (FAC), ¶¶ 22–40. These efforts, which have made it harder and more expensive to propose citizen's initiatives, *see* ECF No. 10-1 (Latshaw Decl.) ¶¶ 5, 9–10, culminated in the passage of SB 1890 in 2021.

SB 1890 imposes a $3,000 limit on the contributions that persons may make to a committee sponsoring a state ballot initiative. Ch. 2021-16, § 1, Laws of Fla. (amending § 106.08, Fla. Stat. (2020)). Violating SB 1890 by making, soliciting, or accepting an over-the-limit contribution carries civil and criminal penalties. FAC ¶¶ 49–53; §§ 106.08(7)–(8), .19(2), Fla. Stat. Before SB 1890, Floridians could donate any amount to support a ballot initiative effort, in the form of both monetary

and in-kind contributions.[1] In fact, there have been no limits on contributions to initiative sponsors ever since Florida's Watergate-era contribution limit for initiative committees was struck down over forty years ago. *Let's Help Fla. v. McCrary*, 621 F.2d 195 (5th Cir. 1980), *aff'd sub nom*. *Firestone v. Let's Help Fla.*, 454 U.S. 1130 (1982).[2]

### B. Plaintiffs and the Fair Elections Campaign

Plaintiffs include three political committees—Fair Vote Florida, Our Votes Matter, and Florida Votes Matter—each sponsoring a citizen initiative, as well as the ACLU of Florida, which supports the Committee Plaintiffs' initiatives.

The ACLU of Florida's mission is to protect, defend, strengthen, and promote the constitutional rights and liberties of all Floridians. Latshaw Decl. ¶ 2. To further its mission, the ACLU of Florida advocates for the expansion of voting rights and participation in elections, including through passage of citizen-initiated constitutional amendments. *Id.* ¶ 3. The ACLU of Florida has supported a ballot initiative effort in the past, including through donating in-kind contributions to a

---

[1] An in-kind contribution is a donation of something other than money—such as labor or supplies—to a political committee, except that a person's volunteer services are not an in-kind contribution. § 106.011(5), Fla. Stat. In-kind contributions are subject to SB 1890's limit, just like monetary contributions. *Id.*; Ch. 2021-16, § 1, Laws of Fla.

[2] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

sponsor committee that would have been illegal under SB 1890. *Id.* ¶¶ 6, 8.

The ACLU of Florida, the People Over Profits Florida, Inc., and other groups plan to launch the Fair Elections Campaign on June 2, 2021 to place three citizen initiatives on the 2022 ballot: the Voting Eligibility Restoration Amendment (VERA); A Voter Registration Method for Eligible Floridians (AVRM); and the Register and Vote Amendment (RAVA) (collectively, "Fair Elections Amendments"). Latshaw Decl. ¶ 12; ECF No. 10-2 (Shaw Decl.) ¶ 5. Fair Vote Florida, Our Votes Matter, and Florida Votes Matter are the sponsors of VERA, AVRM, and RAVA, respectively. Shaw Decl. ¶ 6. The Secretary approved the three initiatives' petition forms for circulation on May 28, 2021. Latshaw Decl. ¶ 13.

The cost of engaging with voters, convincing them to support each initiative, and collecting more than 800,000 valid signatures is enormous; the Committee Plaintiffs expect to have to spend more than $9 million *each* just to collect the requisite signatures by the February 1, 2022 deadline to put their initiatives on the ballot. Shaw Decl. ¶ 8; *see* § 100.371(1), Fla. Stat. To meet this enormous cost, the Committee Plaintiffs planned to solicit and accept both in-kind and monetary contributions in excess of SB 1890's limit after SB 1890's July 1 effective date, and they still desire to do so. Shaw Decl. ¶ 9. If it were lawful, the Committee Plaintiffs would solicit and accept such contributions. *Id.* ¶ 11. Indeed, the Committee Plaintiffs' campaign plans rely on being able to accept contributions in excess of SB

6

1890's limit. *Id.* ¶ 12. The Committee Plaintiffs have identified supporters who plan to give contributions over SB 1890's limit, but for various reasons, those supporters are unable or unwilling to give until after July 1. *Id.* ¶ 13. Furthermore, the Committee Plaintiffs have additional supporters who want to contribute *before SB 1890's effective date*, but who are unwilling to donate *at all* because they are worried that the Fair Elections Campaign will not be viable once SB 1890 goes into effect. *Id.* ¶ 14. Accordingly, SB 1890 severely frustrates the Committee Plaintiffs' ability to advance their initiatives, promote their ideas for improving Florida's democracy, and engage in petition circulation. *Id.* ¶¶ 10, 15. Simply put, the Committee Plaintiffs will not be able to collect the requisite signatures by February 1, 2022 if SB 1890 stands. *Id.* ¶ 15.

Complementing the Committee Plaintiffs' plans, the ACLU of Florida planned to make contributions to the Committee Plaintiffs in excess of SB 1890's limit after July 1, and still desires to do so. Latshaw Decl. ¶ 14. If it were lawful, the ACLU of Florida would make such contributions. *Id.* ¶ 15. But because by doing so Plaintiffs and their officers and employees would be subject to civil and criminal penalties, including potential corporate dissolution, Plaintiffs will not solicit, accept, or make contributions over SB 1890's limit unless SB 1890 is struck down, even though they have a First Amendment right to do so. *Id.* ¶ 16; Shaw Decl. ¶ 16.

Further, the ACLU of Florida is coordinating and consulting with the

7

Committee Plaintiffs on all expenditures it makes in support of the Fair Elections Campaign. Latshaw Decl. ¶ 17 Accordingly, the ACLU of Florida is prohibited from making independent expenditures for the purpose of expressly advocating for the Fair Elections Amendments' approval, and any such expenditures the ACLU of Florida makes will be in-kind contributions to the Committee Plaintiffs subject to SB 1890's limit.[3] § 103.011(5), (12)(a), Fla. Stat.; ch. 2021-16, § 1, Laws of Fla.

### C. Defendant

Defendant is the Florida Secretary of State, whom Plaintiffs sue in her official capacity. The Department of State (DOS) has "general supervision and administration of the election laws." § 15.13, Fla. Stat. As Florida's "chief election officer," the Secretary must "[o]btain and maintain uniformity in the interpretation and implementation of the election laws." *Id.* § 97.012(1). She is responsible for ensuring state compliance with all election laws. *See Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1318 (11th Cir. 2019) (citing Fla. Stat. § 97.012). The Secretary is also responsible for "[c]onduct[ing] preliminary investigations into any irregularities or fraud involving . . . issue petition activities" and "report[ing] . . .

---

[3] Under Florida's campaign finance laws, an independent expenditure "for the purpose of expressly advocating . . . the approval or rejection of an issue" cannot be "controlled by, coordinated with, or made upon consultation with, any . . . political committee" § 106.011(12)(a), Fla. Stat. An "issue" includes "a proposition for which a petition is circulated in order to have such proposition placed on the ballot at an election." *Id.* § 106.011(13).

findings to the statewide prosecutor or the state attorney" for prosecution. § 97.012(15), Fla. Stat. Additionally, the Division of Elections within DOS may refer complaints of violations of the campaign finance laws to the Florida Elections Commission for investigation and civil enforcement. *Id.* § 106.25(2).

## II. ARGUMENT

### A. Legal Standard

Plaintiffs are entitled to a preliminary injunction regarding SB 1890's enforcement if they show: "(1) [they have] a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to [Plaintiffs] outweighs whatever damage the proposed injunction may cause to the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *ACLU of Fla., Inc. v. Miami-Dade Cty. Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009) (quoting *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc)).

As discussed below, Plaintiffs satisfy all four prongs of the Eleventh Circuit's preliminary injunction standard. "The chief function of a preliminary injunction is to preserve the status quo until the merits of the controversy can be fully and fairly adjudicated." *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1284 (11th Cir. 1990). That is precisely what Plaintiffs seek: maintaining the status quo before enactment of SB 1890. Therefore, the Court

should preliminarily enjoin the challenged provision of SB 1890, which unconstitutionally burdens the speech and associational rights of Plaintiffs and other Floridians.

**B. Plaintiffs Are Likely to Succeed on the Merits of Their Claim**

Plaintiffs challenge SB 1890's contribution limit on one ground: it violates their First Amendment rights of association and speech. "Contributions by individuals to support concerted action by a committee advocating a position on a ballot measure is beyond question a very significant form of political expression." *Citizens Against Rent Control*, 454 U.S. at 298; *see also McCrary*, 621 F.2d at 199 ("The right to make political contributions is protected under the first amendment as an important freedom of association."). The Supreme Court explained the importance and historical significance of that form of political expression in *Citizens Against Rent Control*:

> [T]he practice of persons sharing common views banding together to achieve a common end is deeply embedded in the American political process. The 18th-century Committees of Correspondence and the pamphleteers were early examples of this phenomena and the Federalist Papers were perhaps the most significant and lasting example. The tradition of volunteer committees for collective action has manifested itself in myriad community and public activities; in the political process it can focus on a candidate or on a ballot measure. Its value is that by collective effort individuals can make their views known, when, individually, their voices would be faint or lost.

*Id.* at 294.

This type of collective effort is exactly what Plaintiffs seek to pursue by making, soliciting, and accepting contributions to advocate for their initiatives. Shaw Decl. ¶¶ 9–10; Latshaw Decl. ¶¶ 3, 14, 17. Through collective effort, Plaintiffs endeavor to engage with voters throughout Florida, convince voters to support the Fair Elections Amendments, collect millions of signatures (891,589 per initiative), and advance their ballot measures. Shaw Decl. ¶¶ 5, 8, 10.

It is this massive collective effort for political expression that SB 1890 directly impedes. "Placing limits on contributions . . . plainly impairs freedom of expression" and association. *Citizens Against Rent Control*, 454 U.S. at 299. That is so because "freedom of association 'is diluted if it does not include the right to pool money through contributions, for funds are often essential if "advocacy" is to be truly or optimally "effective."'" *Id.* at 296 (quoting *Buckley v. Valeo*, 424 U.S. 1, 65–66 (1976)).

And like other direct encroachments on political expression and association, SB 1890's contribution limit is subject to "exacting judicial scrutiny." *Id.*; *see also McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 199 (2014) (reviewing federal aggregate campaign contribution limits under both strict scrutiny and another form of heightened scrutiny). SB 1890's contribution limit, therefore, must be justified by a significant, legitimate state interest. *Citizens Against Rent Control*, 454 U.S. at 296.

11

But "there is no significant state or public interest in curtailing debate and discussion of a ballot measure." *Id.* None.[4] Just like the initiative contribution limit struck down in *Citizens Against Rent Control*, "[t]he restraint imposed by [SB 1890] on rights of association and in turn on individual and collective rights of expression plainly contravenes both the right of association and the speech guarantees of the First Amendment." *Id.* at 299; *see also McCrary*, 621 F.2d at 201.

This case might stir a sense of déjà vu, and for good reason. In 1973, the Florida Legislature enacted a $3,000 limit on contributions "[t]o any political committee in support of, or in opposition to, an issue to be voted on in a statewide

---

[4]   Compare contribution limits for *initiative sponsor committees* with limits for *candidate committees.* The Supreme Court recognizes "a single narrow exception to the rule that limits on political activity were contrary to the First Amendment." *Citizens Against Rent Control*, 454 U.S. at 296–97. That exception applies to limits on contributions to *candidates*, justified by the legitimate state interest in preventing "corruption and the appearance of corruption spawned by the real or imagined coercive influence of large financial contributions on candidates' positions and on their actions if elected to office." *Buckley*, 424 U.S. at 25.

But "[r]eferenda are held on issues, not candidates for public office. The risk of corruption perceived in cases involving candidate elections [citations omitted] simply is not present in a popular vote on a public issue." *Citizens Against Rent Control*, 454 U.S. at 298 (alterations in original) (quoting *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 790 (1978)). Thus, "[t]he sole governmental interest that the Supreme Court recognized as a justification for restricting contributions was the prevention of quid pro quo corruption between a contributor and a candidate." *Id.* at 297 (quoting *McCrary*, 621 F.2d at 199). "Campaign finance restrictions that pursue other objectives . . . impermissibly inject the Government 'into the debate over who should govern'" and are invalid. *McCutcheon*, 572 U.S. at 192 (quoting *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 750 (2011)). The Supreme Court has "consistently rejected attempts to suppress campaign speech based on other legislative objectives." *Id.* at 207.

election" as part of a comprehensive election code. Ch. 73-128, § 8, at 220, Laws of Fla. (codified at § 106.08(1), Fla. Stat. (1973)). In 1978, the political committee Let's Help Florida—sponsor of a citizen initiative to legalize casino gambling in the Miami Beach area, and represented by ACLU attorney Tobias Simon—challenged the law in this Court. *McCrary*, 621 F.2d at 197; ECF No. 10-3 at 1, Dave Schultz & Bill Douthat, *Casino Backers Want to Kill Contribution Limit*, Miami News, Feb. 28, 1978, at A1. Judge Stafford issued a preliminary injunction just thirty days after the case was filed, blocking the State from enforcing the contribution limit. *Let's Help Fla. v. Smathers*, 453 F. Supp. 1003, 1005 (N.D. Fla. 1978) (reciting procedural history); ECF No. 10-3 at 2, Ron LaBrecque & Andy Rosenblatt, *Pro-Casino Bloc Wins a Round as Court Lifts Donations Limit*, Miami Herald, Mar. 30, 1978, at A1. Less than two months after that, the Court entered a final judgment for Let's Help Florida, declaring the contribution limit unconstitutional and permanently enjoining the defendants from enforcing it. *Smathers*, 453 F. Supp. at 1014.

During the pendency of the case and after the final judgment, Let's Help Florida continued to campaign for its initiative and collect signatures from voters, eventually attaining the requisite petitions to make the 1978 ballot on August 8 of that year. ECF No. 10-3 at 3, Richard Morin, *Casino Issue Wins Spot on Nov. 7 Ballot*, Miami Herald, Aug. 9, 1978, at A1. Judge Stafford's ruling was affirmed by both the Court of Appeals and the Supreme Court. *McCrary,* 621 F.2d 195, *aff'd sub*

13

*nom*. *Firestone*, 454 U.S. 1130. Plaintiffs in this case are in the exact same position as Let's Help Florida—with the same likelihood of success.[5]

It is well-settled that the First Amendment protects "a marketplace for the clash of different views and conflicting ideas." *Citizens Against Rent Control*, 454 U.S. at 295; *see also Meyer v. Grant*, 486 U.S. 414, 421 (1988) ("The First Amendment 'was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'" (quoting *Roth v. United States*, 354 U.S. 476, 484 (1957))). SB 1890 restricts that marketplace by limiting the resources initiative advocates can muster to promote their ideas, persuade voters to support their efforts, and collectively impart ideas on matters of public concern. The restriction cannot be justified by any significant state interest. This Court, therefore, should preliminarily enjoin SB 1890's enforcement because Plaintiffs have demonstrated a likelihood of success on the merits of their claim.

### C. Plaintiffs Will Suffer Irreparable Injury Absent a Preliminary Injunction

The injury to Plaintiffs in the absence of an injunction is by its nature irreparable. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Catholic Diocese of*

---

[5] On the merits of their legal claim, at least. The casinos initiative lost overwhelmingly at the ballot box. ECF No. 10-3 at 4, Bob Ryan, *Gambling Vote Is Win for Askew*, Tallahassee Democrat, Nov. 8, 1978, at A1.

14

*Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) (per curiam) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)).

That principle is especially true here. Plaintiffs are launching the Fair Elections Campaign on June 2, 2021. Latshaw Decl. ¶ 12; Shaw Decl. ¶ 5. Their initiative petitions were approved by the Secretary on May 28, and Plaintiffs are ready and eager to get out into the community to campaign for, discuss, and collect petitions for the Fair Elections Amendments. *See* Latshaw Decl. ¶ 13; Shaw Decl. ¶ 10. But Plaintiffs face a deadline: they have just seven months to collect the 891,589 signatures for each initiative—more than 31,000 signatures per initiative per week, or 93,000 total per week. Shaw Decl. ¶ 8. Plaintiffs cannot meet that deadline without implementing their full campaign plan, including accepting contributions over SB 1890's limit between July 1 and when the initiatives attain ballot status.[6] *Id.* ¶¶ 12, 15. Plaintiffs will not be able to collect the requisite signatures if SB 1890's contribution cap applies during the pendency of this litigation. *Id.* ¶ 15.

If SB 1890 is not enjoined, Plaintiffs will suffer grave and irreparable injury: they will be unable to effectively advocate for the Fair Elections Amendments. They

---

[6]    While SB 1890 does not go into effect until July 1, the law is already frustrating Plaintiffs' ability to disseminate their message and implement their campaign plan. The Committee Plaintiffs have identified certain supporters who wish to make contributions before July 1, but they are unwilling to donate *at all* because they are worried that the Committee Plaintiffs will not be viable under SB 1890's regime. Shaw Decl. ¶ 14. SB 1890 is already chilling the free expression of the Committee Plaintiffs' supporters.

will be unable to engage with the hundreds of thousands of Floridians they wish to persuade to support the Fair Elections Campaign. *Id.* ¶¶ 10, 15. Plaintiffs will be unable to disseminate their message and ideas for improving Florida's democracy. *Id.* ¶ 15. They will be unable to collect the millions of petitions needed to place the Fair Elections Amendments on the 2022 ballot. *Id.*

"[F]unds are often essential if 'advocacy' is to be truly or optimally 'effective.'" *Citizens Against Rent Control*, 454 U.S. at 296 (quoting *Buckley*, 424 U.S. at 65–66). Cutting off the Committee Plaintiffs' ability to raise funds and accept in-kind support from campaign partners, and stopping the ACLU of Florida from donating funds and giving in-kind support to the Committee Plaintiffs, will neuter Plaintiffs' advocacy for the Fair Elections Campaign, irreparably damaging their First Amendment-protected expression and association. As the former Fifth Circuit ruled the last time Florida's initiative contribution limit was struck down, "[a]n injunction is proper in this case because no legal remedy could correct the irreparable injury to plaintiffs' first amendment rights . . . ." *McCrary*, 621 F.2d at 199; *see also Scott v. Roberts*, 612 F.3d 1279, 1295 (11th Cir. 2010) ("An injury is irreparable if it cannot be undone through monetary remedies."). That principle applies equally to Plaintiffs in the instant case.

### D. The Balance of Equities Favors Granting a Preliminary Injunction

The threatened injury to Plaintiffs' First Amendment freedoms of association

16

and speech outweighs any damage that an injunction might cause the Secretary.

A preliminary injunction will not cause the Secretary any harm. Plaintiffs' requested relief requires the Secretary to keep Florida's current campaign finance regime in place, as it has stood since the preliminary injunction this Court issued in *Let's Help Florida*. The Secretary will suffer no harm in continuing in this manner until there is a final resolution to this case. *United States v. Lambert*, 695 F.2d 536, 540 (11th Cir. 1983) ("[T]he harm considered by the district court is necessarily confined to that which might occur in the interval between ruling on the preliminary injunction and trial on the merits."). Meanwhile, Plaintiffs will suffer denial of their constitutional right to effectively advocate for the Fair Elections Amendments.

### E. A Preliminary Injunction Will Serve the Public Interest

Enjoining SB 1890 undoubtedly promotes the public interest by allowing all Floridians to exercise their First Amendment rights to support ballot initiatives. "The vindication of constitutional rights and the enforcement of a federal statute serve the public interest almost by definition." *League of Women Voters of Fla. v. Browning*, 863 F. Supp. 2d 1155, 1167 (N.D. Fla. 2012). Indeed, "[t]he public has no legitimate interest in enforcing an unconstitutional [law]." *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006). And as discussed in depth above, SB 1890 is unequivocally unconstitutional under longstanding, binding precedent. *Citizens Against Rent Control*, 454 U.S. at 299; *McCrary*, 621 F.2d at 201.

17

The public interest favors permitting Floridians to make in-kind and monetary donations in support of ballot initiatives above SB 1890's limit, so that every citizen can exercise their rights to engage in core political expression: collective action to circulate political ideas. *Cf. Cuomo*, 141 S. Ct. at 68 (finding an injunction in the public interest because the challenged restrictions "strike at the very heart of the First Amendment's guarantee of religious liberty"). By contrast, permitting SB 1890's enforcement—including through criminal penalties and corporate dissolution—will violate Plaintiffs' and others' rights of expression and speech, restricting the marketplace of ideas. Furthermore, an injunction serves the public interest in avoiding the unnecessary cost and effort of enforcing a statute that will likely be struck down. *Fla. Businessmen for Free Enter. v. City of Hollywood*, 648 F.2d 956, 959 (5th Cir. Unit B June 1981) ("The public interest does not support the city's expenditure of time, money, and effort in attempting to enforce an ordinance that may well be held unconstitutional.").

Under these circumstances, then, an injunction is in the public interest.

### III.  CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully request that the Court grant their Motion for a Preliminary Injunction.

## LOCAL RULE 7.1(F) CERTIFICATE

This memorandum contains 4,062 words.

Dated: June 1, 2021

                      Respectfully submitted,

                       /s/ *Nicholas Warren*
                      Nicholas Warren (Fla. Bar No. 1019018)
                      Anya A. Marino (Fla. Bar No. 1021406)
                      Daniel B. Tilley (Fla. Bar No. 102882)
                      Max Gaston (*pro hac vice* motion pending)

                      **ACLU FOUNDATION OF FLORIDA, INC**.
                      4343 West Flagler Street, Suite 400
                      Miami, FL 33134
                      (786) 363-1769

                      nwarren@aclufl.org
                      amarino@aclufl.org
                      dtilley@aclufl.org
                      mgaston@aclufl.org

                      *Counsel for Plaintiffs*